FILED
Clerk
District Court
DEC 22 2023
for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BONIFACIO VITUG SAGANA (a/k/a "BONI"),<br><br>Defendant. | Case No. 1:22-cr-00002<br><br>**MEMORANDUM DECISION DENYING DEFENDANT'S MOTION FOR A NEW TRIAL** |

After a three-day trial,[1] a jury found Defendant Bonifacio Vitug Sagana guilty of conspiracy to unlawfully produce an identification document. (Mins. – Day 3, ECF No. 142; Verdict Form, ECF No. 144.) Before the Court is Sagana's motion for a new trial contending that the "pervasive and false pretrial publicity" alleging he fled Saipan prior to his arrest violated his Sixth Amendment right to a trial by an impartial jury. (Mot. 1, ECF No. 156.) Sagana claims that the voir dire conducted was insufficient and "a more searching inquiry into the effects of pretrial publicity in the small CNMI community was necessary to ensure a fair trial by an impartial jury." (*Id.* at 8.) The Government opposed the motion (Opp'n, ECF No. 158) to which Sagana replied (Reply, ECF No. 161). At a hearing held on December 18, 2023, prior to the commencement of sentencing, the parties submitted the motion on the briefs. (Mins. 1, ECF No. 169.) The Court denied the motion (*id.*) and now issues this memorandum decision detailing its rationale.

//

---

[1] This calculation omits the day spent selecting a jury. (*See* Mins., ECF No. 127.)

## I. PROCEDURAL HISTORY

The grand jury returned an Indictment in January 2022 charging Sagana with the offense of conspiracy to unlawfully produce an identification document, in violation of 18 U.S.C. § 1028(a)(1) and (f), which occurred on February 16, 2017. (Indictment, ECF No. 1.)

A year prior to the return of the Indictment, in January 2021, Sagana received an "employment authorization and advance parole from the U.S. Citizenship and Immigration Services. Two months later, federal agents executed a search warrant at Sagana's home. On the day of the search, Sagana admitted that he was aware he was under investigation regarding the unlawful production of driver's licenses." (Mem. Decision on Def.'s Omnibus Mots. in Limine 13, ECF No. 110.) On June 14, 2021, Sagana left the island of Saipan, Commonwealth of the Northern Mariana Islands ("CNMI"), for Wisconsin. (*Id.*)

The Court issued an arrest warrant related to this case for Sagana at the end of January 2022; he was subsequently arrested in Wisconsin three months later. (Arrest Warrant, ECF No. 153.) In June 2022, two CNMI local newspapers began reporting about Sagana's departure from the CNMI prior to his arrest. (*See* ECF Nos. 156-1–156-6.)[2] The newspapers continued to report Sagana's purported fleeing in seven articles until the day of jury selection on July 6, 2023. (*Id.*) The night before jury selection, KSPN2, the CNMI's only local television station, broadcasted a story regarding the upcoming trial and noted that "Sagana fled to the States before he could be arrested." (Mot. 3-4 (citation omitted).) The day of jury selection, the Court granted Sagana's request for a chambers conference regarding the possible tainting of the jury pool based upon media coverage. (*See* Req. for Chambers Conference, ECF No. 120; docket entry dated July 6,

---

[2] Pursuant to Federal Rule of Evidence 201(b)(1) and Sagana's request, (Mot. 2 n.1), the Court takes judicial notice that *Marianas Variety* and *Saipan Tribune* are newspapers that are widely circulated in the CNMI.

2023.) At the chambers conference, the Court and the parties discussed the issue regarding media coverage and possible solutions.

Prior to trial, Sagana filed under seal pursuant to the parties' request, a motion in limine to exclude evidence of his relocation to Wisconsin. (Order Granting Joint Mot. Seal, ECF No. 88; Def.'s Omnibus Mots. in Limine, ECF No. 90.) The Government sought to introduce evidence of Sagana's relocation to Wisconsin as evidence of consciousness of guilt. (*See* Def.'s Omnibus Mots. in Limine 1.) Ultimately, the Court granted Sagana's motion in limine to exclude evidence of his relocation to Wisconsin such that the Government was precluded from introducing evidence of Sagana's relocation to Wisconsin as evidence of consciousness of guilt. (Mem. Decision on Def.'s Omnibus Mots. in Limine 15.)

While the Court rejected Sagana's request for each party to voir dire the jury panel for one hour each (*id.* at 12), the parties provided proposed voir dire questions (ECF Nos. 101, 115, 121), which the Court adopted in large part (*see* Tr. Jury Selection, 200-01, 279-80, ECF No. 149; *e.g.*, Opp'n 3).

## II.  LEGAL STANDARD

Federal Rule of Criminal Procedure 33 dictates that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "When based upon the proper legal standard, a decision to grant or deny a new trial is within the sound discretion of the district court." *United States v. Steel*, 759 F.2d 706, 713 (9th Cir. 1985) (citation omitted). "The defendant has the burden to justify the need for a new trial." *United States v. Nation*, 370 F. Supp. 3d 1090, 1129 (C.D. Cal. 2019) (citing *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986)).

//

/

## III. DISCUSSION

At jury selection, co-defense counsel conceded that "based on the responses to the media questions I think the voir dire was effective." (Tr. Jury Selection 280.) The other co-defense counsel also agreed. (*Id.* at 318.)[3] Similarly, the Court finds that the voir dire it conducted sufficiently addressed the possibility of any juror having any prior knowledge about the case from the media coverage, and concludes that the jury selection process did not violate Sagana's right to an impartial jury.

The Sixth Amendment guarantees "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]" "An examination or 'voir dire' of prospective jurors helps to ensure that the defendant is tried by an impartial jury." *United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979). As the Ninth Circuit observed, "[i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity[.]" *United States v. Polizzi*, 500 F.2d 856, 880 n.40 (9th Cir. 1974) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961)). Almost fifty years later, this observation still holds true, especially with the rapid modernization of technology. Accordingly, "[a] defendant is entitled to an impartial jury, not one ignorant of the facts." *United States v. Flores-Elias*, 650 F.2d 1149, 1151 (9th Cir. 1981) (citation omitted). To balance a defendant's right to an impartial jury with the pervasiveness of media, "the trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *Silverthorne v. United States*, 400 F.2d 627, 637 (9th Cir. 1968) (citing *Holt v. United States*, 218 U.S. 245, 251 (1910)).

---

[3] The Court asked defense counsel if he wanted to memorialize the issue regarding media exposure discussed at the chambers conference or if he was satisfied with the outcome of voir dire. (Tr. Jury Selection 318.) Defense counsel responded that they "have no problems." (*Id.*)

There is "no precise rule [that] prescribes the type of voir dire examination which is necessary to protect against prejudicial pretrial publicity. The appropriate scope and detail of the voir dire depend on the level of pretrial publicity and the discretion of the district court." *Giese*, 597 F.2d at 1183. A higher standard is required for trials where "pretrial publicity is great" compared to "cases of less publicity." *Id.* To help a trial court gauge which type of voir dire is required, "the responses of the first jurors queried can serve as an indication . . . of the amount of publicity the case has generated." *Id.*

Where pretrial publicity is great, the trial court "must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defect or impair the rights of an accused." *Id.* (quoting *Silverthorne*, 400 F.2d at 637-38). Voir dire must go beyond a "simpl[e] call for the jurors' subjective assessment of their own impartiality, and it must not be so general that it does not adequately probe the possibility of prejudice." *Id.* (quoting *Polizzi*, 500 F.2d at 879). Rather than direct a general question to the entire group of prospective jurors, the trial court "should conduct a careful, individual examination of each prospective juror, preferably out of the presence of the other jurors." *Id.* (citations omitted). On the other hand, such stringent procedures are not required for cases with less publicity. *Id.* "Several general questions addressed to the entire panel of jurors, followed by individual questioning of jurors who respond affirmatively to the initial inquiries, may be sufficient if it becomes clear that few jurors have any knowledge of the case." *Id.* (citations omitted).

In *Giese*, where the defendant was convicted of conspiracy to bomb several U.S. military recruiting centers in protest to the Vietnam War, "almost every juror had little or no prior knowledge of [the defendant's] indictment, arrest, and pending trial" and of those with prior knowledge of the case, almost all "had only the vaguest understanding of the crimes committed and the political issues allegedly at stake." *Id.* at 1184, 1184 n.11. The Ninth Circuit concluded

that "[t]he absence of a significant number of jurors who were influenced by, or had even seen, coverage of appellant's case in newspapers and on radio and television reinforced" the propriety of the trial court's approach to voir dire of that case with less publicity. *Id.* at 1184. Further, the Ninth Circuit observed that "[o]nly in a case involving extreme pretrial publicity with demonstrated effects on the prospective jurors, have we held that a trial court's voir dire was inadequate." *Id.*

That case involving extreme pretrial publicity is *Silverthorne*, in which the Ninth Circuit reversed a bank fraud conviction as the defendant "was not accorded a fair trial, free from prejudice or . . . the probability of prejudice." *Silverthorne*, 400 F.2d at 630-31. The case involved great pretrial publicity because within the span of about a year, "the San Francisco Bay area newspapers were saturated with more than 300 articles concerning [the defendant] and the alleged reasons for the closing of the bank," which was related to the conviction. *See id.* at 631. The trial court's voir dire "did not adequately dispel the probability of prejudice accruing from the pre-trial publicity and the jury panel members' knowledge of the case" because the court's questions were subjective and "too general to adequately probe the prejudice issue." *Id.* at 638. Based on "the voluminous publicity antedating [the] trial, some of which was prejudicial in nature, and in view of the trial court's denial that any prejudice existed because of pretrial publicity, the court's voir dire examination should have been directed to the individual jurors." *Id.* at 639. Further, the trial court erred in refusing to entertain defense counsel's request that the court ask the jury "what information they had obtained relative to the case and their source of knowledge." *Id.*

Here, while the Court previously stated that this case had garnered "high publicity in this small community," (Mem. Decision on Def.'s Omnibus Mots. in Limine 12), such a statement was quickly dispelled during jury selection when only five of the forty-nine prospective jurors had been exposed to the media coverage regarding the case (*see* Tr. Jury Selection 49, 70, 71-75, 87-90,


197; *see, e.g.*, Mot. 5; Opp'n 3 n.1). The latter is informative as the Ninth Circuit has recognized the importance of prospective jurors' responses to determine the amount of publicity a case has generated. *See Giese*, 597 F.2d at 1183. The CNMI is a smaller community than that of San Francisco in *Silverthorne* such that it would be unreasonable to expect 300 articles pertaining to the instant case. The seven articles written about Sagana here do not constitute a barrage, even within the CNMI. Therefore, pretrial publicity was not so great to necessitate the parties' individualized examinations of each prospective juror. Unlike the trial court in *Silverthorne*, the undersigned was cognizant of the potential prejudice of the articles (as reflected in the decision granting Sagana's motion in limine excluding evidence of his relocation to Wisconsin) and addressed the issue accordingly. In addition to further questioning the first juror who admitted exposure to media, the Court opened the question to the rest of the prospective jurors. (Tr. Jury Selection 70-72.) Not only did the Court ask the entire group of prospective jurors, but it asked the jurors again by section. (*Id.* at 71.)[4] With this line of questioning, the Court's approach here differs from that of the court in *United States v. Waters*, 627 F.3d 345 (9th Cir. 2010), which Sagana cites in his motion (Mot. 6-7). In *Waters*, the defendant was charged and convicted of arson. 627 F.3d at 348. During jury deliberation, the local media reported on an arson that had just occurred, and some articles attributed the crime to a domestic terrorist group that the defendant had a connection with. *Id.* at 349, 362. The Ninth Circuit concluded that the trial court's minimal efforts to address the potential prejudice was insufficient as the trial court "did nothing to determine whether any juror had read or heard about the news stories, let alone to determine how, if at all, any juror who knew of the publicity was affected by it." *Id.* at 364. Here, the Court explicitly asked the potential jurors whether they had any media exposure to the instant case. (Tr. Jury Selection 70-72.)

---

[4] At the outset, the Court divided the panel of prospective jurors into three separate groups. (Tr. Jury Selection 6.)

Moreover, unlike the defense counsel in *Silverthorne*, who had requested additional voir dire questions, Sagana's attorneys did not request further voir dire questions that the Court did not cover. (*See* Opp'n 4.) In accordance with the Court's determination that this case garnered less publicity such that individualized questioning of the prospective jurors was unnecessary, the voir dire was conducted pursuant to the Ninth Circuit's guidance for such cases. Specifically, after the Court asked the general question about exposure to media coverage on this case, the Court individually questioned jurors who responded affirmatively, which is sufficient as only five jurors had any knowledge of the case through the media. *See Giese*, 597 F.2d at 1183. None of these five panelists with prior knowledge of the case through the media had formed an opinion about Defendant's guilt or innocence, or were selected to serve on the jury.

Sagana criticized the Court for not inquiring "on the current news stories that Mr. Sagana had fled to avoid arrest." (Mot. 7.) However, such an inflammatory question would have "only fanned the embers of incipient prejudice by arousing curiosity." *Flores-Elias*, 650 F.2d at 1151.

### IV.    CONCLUSION

Based on the record, the Court finds that the voir dire conducted in this case did not violate Sagana's Sixth Amendment right to a trial by an impartial jury. Sagana has not met his burden to demonstrate the need for a new trial as the interest of justice does not require such. For these reasons, the Court DENIES Sagana's motion for a new trial.

IT IS SO ORDERED this 22nd day of December 2023.

RAMONA V. MANGLONA
Chief Judge